Filed 7/12/22  P. v. Oliva CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL JAMES OLIVA,<br><br>    Defendant and Appellant. | D078611<br><br><br><br>(Super. Ct. No. SCN388238) |


APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed as modified and remanded with instructions.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, A. Natasha Cortina, Assistant Attorney General, Arlene A. Sevidal, Andrew S. Mestman and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Daniel James Oliva of 18 counts of sexual abuse against three children (Jane Doe 1, Jane Doe 2, and Jane Doe 3), and one count of physical abuse against another child (John Doe).[1]  On appeal, Oliva contends the trial court prejudicially erred when it admitted expert testimony on the behavior of child victims of sexual abuse.  He further contends the court gave a jury instruction that likely caused the jury to convict him based on acts of sexual abuse he committed outside the territorial jurisdiction of the superior court.

We reject Oliva's challenges to the verdict.  However, we shall vacate any portion of the $154 criminal justice administration fee imposed pursuant to now-repealed Government Code section 29550.1 that remains unpaid as of July 1, 2021.  We remand the matter to the trial court with directions to correct the entry of an erroneous fee amount on the abstract of judgment and to reflect the vacatur.  We affirm the judgment in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *The Offenses*

In an amended information, Oliva was charged with 21 felony counts for his repeated sexual abuse of Jane 1, Jane 2, and Jane 3, and physical abuse of John:

---

[1]    We subsequently refer to Jane Doe 1, Jane Doe 2, Jane Doe 3 and John Doe as Jane 1, Jane 2, Jane 3, and John, respectively.

2

Counts 1 and 2:  oral copulation with a child 10 years old or younger, committed against Jane 1 between July 4, 2007 and July 4, 2009 (Pen. Code,[2] § 288.7, subd. (b));

Counts 3 and 4:  forcible lewd act on a child under 14, committed against Jane 1 between September 9, 2010 and July 4, 2013 by placing her mouth onto his "crotch area" (§ 288, subd. (b)(1));

Counts 5 and 6:  forcible lewd act on a child under 14, committed against Jane 1 between July 4, 2012 and July 4, 2013 by placing her "crotch onto [his] crotch area" (§ 288, subd. (b)(1));

Counts 7 and 8:  forcible oral copulation, committed against Jane 1 between July 4, 2013 and July 4, 2017 (former § 288a, subd. (c)(2)(A), now § 287, subd. (c)(2)(A));

Counts 9 and 10:  forcible rape, committed against Jane 1 between July 4, 2013 and July 4, 2017 (§ 261, subd. (a)(2));

Counts 11 and 12:  forcible lewd act on a child under 14, committed against Jane 2 between October 31, 2012 and October 31, 2015 by placing her mouth onto his "crotch area" (§ 288, subd. (b)(1));

Counts 13 and 14:  forcible rape, committed against Jane 2 between October 31, 2012 and October 31, 2017 (§ 261, subd. (a)(2));

Counts 15 and 16:  forcible oral copulation, committed against Jane 2 between October 31, 2015 and October 31, 2017 (former § 288a, subd. (c)(2)(A), now § 287, subd. (c)(2)(A));

Counts 17 and 18:  oral copulation with a child 10 years old or younger, committed against Jane 3 between December 10, 2012 and December 10, 2015 (§ 288.7, subd. (b));

---

[2]     Further unspecified statutory references are to the Penal Code.

3

Counts 19 and 20: forcible lewd act on a child under 14, committed against Jane 3 between December 10, 2012 and December 10, 2015 by placing her mouth onto his "crotch area" (§ 288, subd. (b)(1)); and

Count 21: felony child abuse against John (§ 273a, subd. (a)).

Counts 1 through 6, 11, 12, and 17 through 20 were further alleged to involve substantial sexual conduct. (§ 1203.066, subd. (a)(8).) Counts 3 through 16, 19 and 20 were alleged to involve multiple victims. (§ 667.61, subds. (b), (c), & (e).) In the commission of count 21, Oliva was alleged to have personally inflicted great bodily injury. (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8).) Before trial, counts 1 and 2 were dismissed on the prosecutor's motion.

Oliva was tried by a jury, jointly with his codefendant, Lorie Lovella Welch, the mother of the four victims. After deliberating for three days,[3] the jury found Oliva guilty on counts 3 through 21 and found true all of the corresponding enhancement allegations.[4] The trial court sentenced Oliva to a total prison term of 240 years to life, consecutive to five years.[5]

---

[3] After the original jury deliberated for two days, a juror was excused for misconduct and was replaced with an alternate juror. The newly-configured jury was instructed to start deliberations over from the beginning. The verdict was reached approximately three days later.

[4] Welch was charged in the amended information with four counts of felony child abuse (§ 273a, subd. (a); counts 22 through 25), one for each child, based on allegations she permitted each of the children to be placed in a situation where his or her person and health was endangered. The jury convicted Welch as charged. She was sentenced to a total term of six years in prison. She is not a party to this appeal.

[5] The sentence consisted of consecutive 15-year-to-life terms on counts 3 through 18, plus five years on count 21 (lower term of two years for child

II.

*The Trial*

The People presented testimony from Jane 1, Jane 2, Jane 3, and John, and family friends to whom the victims made their disclosures, among others.[6] Oliva testified in his defense. Welch did not testify.

A. *Prosecution Case*

Welch met Oliva, an active-duty Marine, in 2005 when she was pregnant with Jane 3. Welch and Oliva were married in 2006 and moved into base housing at Camp Pendleton along with baby Jane 3.

At the time, Jane 1, Jane 2, and John were living at their paternal grandmother's house along with a number of relatives, including their father. The three children were removed from father's care and Mother was awarded custody. So in 2007 or 2008, Jane 1, Jane 2, and John went to live with their mother, Oliva, and Jane 3, at Camp Pendleton. Jane 1 was eight years old (born in 1999), Jane 2 was six years old (born in 2001), and John was three years old (born in 2004), approximately.

In 2010, the family moved to Jacksonville, North Carolina. In March 2012, Oliva left the military for medical reasons and the family moved back to California. They lived in a house in Oceanside. Jane 1, Jane 2, Jane 3, and John lived in the Oceanside house with Welch and Oliva until late 2017,

---

abuse, increased by three years for the great bodily injury enhancement). The court stayed punishment on counts 19 and 20 under section 654.

[6] The People also called an expert to testify about common myths or misperceptions regarding child sexual abuse and child sexual abuse victims. We summarize his testimony in our discussion of Oliva's claim of error related to the expert's testimony at Discussion, Section I.A., *post*.

shortly before the sexual and physical abuse were reported to law enforcement.

    1.    *Jane 1 (counts 3 through 10)*

At the time of trial, Jane 1 was 20 years old. She testified she had been sexually abused by Oliva for approximately 10 years, from the time she was eight years old until shortly after she turned 18.

The first time Oliva sexually abused Jane 1, she was around eight years old and the family was living in base housing at Camp Pendleton. Oliva grabbed her wrist and pulled her into a bathroom. There, he blindfolded her and shoved something in her mouth. She did not know what it was, but she "knew it didn't belong there." She could not breathe, and she felt a gagging sensation in the back of her throat. She was very afraid.

The next sexual assault happened in Texas, as the family was driving across the country to North Carolina. Oliva was driving a U-Haul truck, with Jane 1 as his passenger, and the rest of the family was in a vehicle driven by Welch. Oliva pulled Jane 1's head down towards his groin. His zipper was down, and his pants were unbuttoned. She was able to see because "[l]ights were flashing from the other cars that passed by." It was the first time she had seen "a private part on a boy." His penis entered her mouth, and she felt the same gagging sensation she felt when he blindfolded her in the bathroom. She was very afraid. The assault ended when he ejaculated in her mouth.

The sexual abuse continued in North Carolina. On multiple occasions, Oliva forced Jane 1 to orally copulate him. He pulled Jane 1 into a bedroom, placed her on her knees by the bed, and put his penis in her mouth. She did not say anything, because she was afraid of Oliva and she did not want to be hurt.

6

When Jane 1 was around 11 years old, Oliva had full sexual intercourse with her. He pulled her into a room, removed her clothes, and penetrated her vagina with his penis. It was painful for her, and she wanted it to stop. She did not tell her siblings or her mother about it because she did not want the family to be torn apart. Part of her was hoping it was a bad dream.

After the family moved back to Oceanside in March 2012, Oliva continued to abuse Jane 1. When she was 13 years old and in the seventh grade, he made her orally copulate him more than once. He did this in her mother's bedroom when her mother and siblings were not home.

After the family returned to Oceanside, the sexual intercourse "became more constant." Oliva had sexual intercourse with her more than one time when she was in the seventh grade. Oliva would wear a condom; he told her the purpose of a condom was "to keep people from getting pregnant."

The sexual abuse continued when Jane 1 was 14 years old and in the eighth grade, and throughout her time in high school. She remembered one instance of oral copulation when she was in eighth grade, and another when she was in high school. However, "most of the time it was just penetration." Oliva had sexual intercourse with her approximately once every two months while she was in high school. The intercourse happened in her mother's bedroom. It also happened in the bathroom, while Jane 1 was showering. As a result, she "would rush in the shower" and "never felt safe in the shower unless the door was locked." Jane 1 was frequently afraid she was pregnant and "always had the fear of having to become a young teen mom."

Oliva also sexually abused Jane 1 outside the home. On several occasions, he took her to a hotel room or to a secluded parking lot to have sexual intercourse with her.

One time when Jane 1 was in high school, she was in the kitchen with Jane 2. Oliva came in and "he told [Jane 1] what he was doing to [Jane 2], and he told [Jane 2] what he was doing to [Jane 1]." Jane 1 denied that Oliva ever had sexual intercourse with her and Jane 2 at the same time.

Jane 1 did not tell anyone about the sexual abuse. She was afraid of what people would think of her and did not want to be abandoned. She had learned from reality shows that "when someone comes out as being a victim . . . they're not forgiven" but instead were "a target of major bullying." She thought her mother would look down on her. And she was afraid of Oliva because she believed he "was a man that could kill."

In 2009 and 2010, when interviewed by Child Protective Services workers, she said she was not being sexually abused. At the time, she was living at Camp Pendleton, and Oliva was using the blindfold on her; she did not know that what he was doing to her was abuse. Also, her mother had told the children since their father lost custody, "after her, there would be no one else to take [them] in" and they should "all stick together." In May 2013, when talking to a school counselor, she did not say she was being abused. She was not comfortable with the school counselor, and she did not want her family and siblings to be separated.

The last time Oliva had sexual contact with Jane 1 was in September 2017, when she was 18 years old and a senior in high school. Welch walked into the bedroom while Oliva was having sexual intercourse with Jane 1. Although Jane 1 did not know it at the time, Jane 2 had seen Oliva "take [Jane 1] to the back room" and had sent a text message to Welch telling her to come home. Upon seeing Oliva on the bed with Jane 1, Welch crossed her arms and said "Really," and Jane 1 rushed out of the room. Welch blamed Jane 1 for Oliva's behavior and called her a "whore." Afterward, Jane 2

8

asked Jane 1 what had happened with their mother. Jane 2 cried, and Jane 1 consoled her.

Jane 1 hoped her mom "would make the right decision." But Welch decided to "give [Oliva] another chance." Jane 1 felt her mother was choosing him over her children.

2.    *Jane 2 (counts 11 through 16)*

Jane 2 was 18 years old at the time of trial. Oliva sexually abused Jane 2 starting when she was six or seven years old and the family was living in base housing at Camp Pendleton, and continuing through the time they were living in Oceanside.

Jane 2 did not have clear memories of the time the family was living at Camp Pendleton. She recalled there was at least one occasion when she had to touch Oliva's private areas. On another occasion, when her mother was not around, Oliva grabbed her buttocks over her clothes.

When Jane 2 was eight years old and the family was living in North Carolina, Oliva forced her to orally copulate him. He took her to one of the bathrooms. He "dropped his shorts" and told her to get on her knees. He was "fairly aggressive." And she was afraid of him because he was "a scary guy" and she was a small child. He grabbed the back of her head or her neck and pushed her head back and forth on his penis. Other similar incidents happened in his bedroom or her bedroom. One time when Jane 2 was wearing a bathing suit, Oliva called her into the living room. He removed her swimsuit bottoms and made her "squat over him." He tried to have intercourse with her and kept going even though she was crying and screaming for him to stop. Eventually he gave up. He took her outside to the pool and acted is if nothing had happened. Jane 2 remembered that assault "vividly."

9

Oliva continued to sexually abuse Jane 2 after the family moved back to Oceanside in March 2012, when Jane 2 was 10 years old and was completing the fourth grade. He forced her to orally copulate him on more than one occasion when she was between fourth and fifth grade, and on more than one occasion when she was in sixth and seventh grade. These acts generally occurred in Oliva's bedroom. Oliva would grab her arm or tell her to go, and she would obey out of fear. He would close the bedroom door, lock it, and force her to orally copulate him.

When Jane 2 was in middle school, Oliva began having sexual intercourse with her. She estimated there were more than five times when he had sexual intercourse with her when she was alone with him in his bedroom. She testified there were also five or six times when she and Jane 1 were in the same room and Oliva locked the door, closed the blinds and had intercourse with both girls, holding them down so they could not get away. She testified she had not discussed these incidents with Jane 1, explaining they were "very uncomfortable to talk about" and "very uncomfortable and difficult to . . . deal with."

Sometimes Oliva would sexually abuse Jane 2 in his vehicle. Once when she was in middle school, he drove her to a transit station and forced her to orally copulate him. On another occasion when she was a freshman in high school, he picked her up after band practice, took her to a Walmart parking lot and made her perform oral sex on him. She described another instance when Oliva was driving his vehicle, she was in the front seat, and Jane 1 was in the back seat. Oliva put his arm up so that Jane 1 would not see. He put lotion in Jane 2's hand, grabbed her wrist and made her move her hand up and down on his penis.

Jane 2 did not remember when the last touching occurred. More than once, Oliva threatened to hurt or kill Jane 2 if she told anybody about the abuse. Jane 2 believed him. He was "very aggressive," and she believed his threats. In her words, "anything he said he would do to me he would do to me."

Jane 2 told her mother about the sexual abuse when they were living in North Carolina. Welch pointed a gun at Oliva and told him she would kill him if he touched her children again. But Oliva denied he was abusing the children, and Welch believed him.

After they moved back to California, Jane 2 would tell Welch the sexual abuse was continuing. Welch accused Jane 2 of "just making stuff up" about Oliva because she did not like him. Jane 2 did not tell anyone other than her mother about the sexual abuse because she was embarrassed and "he had said not to tell anybody and [she] was scared."

When Jane 2 would see Oliva "take [Jane 1] to the back room," she would text and call their mother. Welch would get mad or ignore her texts and calls. The time when Welch walked in on Oliva having sex with Jane 1, Jane 2 had texted Welch to come home. Normally, when Welch came home, Oliva "would quickly start opening up blinds and he would make [them] get dressed . . . before she would come in." This time, Welch turned her motorcycle off up the street and rolled it down to the house without making noise. Jane 2 walked with Welch to the bedroom. When Welch opened the door and saw Oliva having sex with Jane 1, Jane 2 was relieved because she thought the sexual abuse "was over." Instead, Welch "saw it and she forgave him."

### 3. *Jane 3 (counts 17 through 20)*

Jane 3 was 14 years old when she testified at trial. Oliva sexually abused her on more than one occasion. The first time happened in Oceanside when she was seven to nine years old and in the second or third grade. Oliva led her to his bedroom, had her sit on a chair, and put a blindfold over her eyes. He told her to open her mouth. He stuck something inside her mouth and told her not to bite. She could not see what it was and did not recall how long it was in her mouth. He removed the thing from her mouth, took the blindfold off, and told her to go to her room.

The same thing happened two weeks later, only this time the blindfold was loose, and Jane 3 could see Oliva's penis going into her mouth. Oliva did this to her a third time when she was in the second or third grade. On this occasion the blindfold was not loose and she could not see anything, but by now she knew what he was sticking in her mouth and she was scared because he was bigger than she was. At first while Jane 3 was testifying, she remembered three times when Oliva put his penis in her mouth. After her recollection was refreshed, she testified he had done this to her five times.

Initially, Jane 3 did not tell anyone about the sexual abuse. After the third or fourth time, she told her mother, because she felt scared. Her mother was "gone a lot" and was often at work or "at a bar singing." When Jane 3 disclosed the abuse, they had just watched a movie together and Jane 3 felt it was the right time to tell her. Jane 3 told Welch that Oliva had put his penis in her mouth. Welch then got a gun, pointed it at Oliva, and told him, "Don't touch my little girl." Jane 3 believed the sexual abuse happened at least one more time after that.

There were times when social workers from Child Protective Services would ask Jane 3 if anyone in her household was "touching [her] in wrong

12

areas." She would say no because she was afraid of losing her mom and her siblings.

4.    *John (count 21)*

John was 15 years old at the time of trial. Oliva physically abused him from the time he was in elementary school in Oceanside and continuing throughout middle school. John was terrified of Oliva but felt there was no way of stopping the abuse because Oliva was "an ex-Marine" and was bigger, stronger, and fitter than he was.

Oliva would punch John and "choke [John] out," while claiming he was trying to teach John to "be a man." This happened in the presence of John's sisters, and occasionally his mother. Jane 2 testified that John "would try to scream 'help,' but he couldn't because he was being choked." More than once, Oliva choked John to unconsciousness. Jane 2 described that John "would start turning red and trying to tuck his chin under [their] stepfather's elbow, but he would fail because he's not strong enough. He would start turning blue, and then his eyes would just roll back and close."

Oliva once punched John in the chest, hurting him. On one occasion when Oliva was trying to "roughhouse" with John, Oliva broke John's right arm. John recalled breaking his right arm another time while riding a skateboard.

Another instance of physical abuse happened when John was sitting in the kitchen with Welch. Oliva kicked him in the thigh, knocking him to the floor. Oliva kept kicking him, hard, while he was on the floor. John sustained bruises on his thigh from the kicking.

Once, as Oliva was trying to walk past John, Oliva threw him onto the couch, which was full of sharp, L-shaped metal braces. John landed on the metal braces and cut his back. Jane 3 testified the cut "look[ed] like someone

13

tried to cut open his back with a scalpel." Susan and Aaron, friends of the family whom the children called "Aunt" and "Uncle," testified they saw the scar on John's back when the children were swimming. Susan was "shocked" because it was a "huge gash" and did not look like it was healing properly.

5.    *Disclosure of Abuse*

In December 2017, all four siblings spent most of their winter break with Susan and Aaron at their home in Escondido. On December 30 or 31, Jane 2 told Susan and Aaron that Oliva was sexually abusing her and her sisters. One of the reasons Jane 2 decided to disclose the abuse to Susan and Aaron was that she was upset at Oliva because she had learned Oliva was cheating on Welch.

Susan talked to Jane 1 about what Jane 2 had revealed. Although it upset Jane 1 to talk about the abuse, Susan hugged her and made her feel safe, so she told Susan "everything." Jane 1 was angry that her mom "didn't do anything." She was also mad at herself that she "didn't do anything" and "didn't stop it." She testified, "right then and there I knew it had to stop." She wanted to protect her siblings. She felt that Susan "was listening" and "was actually willing to help." Aaron, who was present for the conversation, testified Jane 1 "[v]ery solemnly confirmed" the sexual assaults and was "misty-eyed" and "was looking [at them] straight in the eyes."

Aaron and Susan thought law enforcement should be called and gave the siblings the opportunity to decide whether to notify law enforcement themselves. They decided to do so. As Jane 1 was then 18 years old and an adult, she was the one who called 911. Before the police were summoned, Susan called Welch and put Welch on speakerphone in the presence of the two older sisters. Susan wanted to let Welch know what had been disclosed, and planned to tell Welch she could stay with her if she needed help. But

14

Welch defended Oliva, yelled at her children, and said they were accusing him of wrongdoing because they were "evil."

The police arrived at Susan and Aaron's home a short time later. The police took the four siblings to the Oceanside police station. The three youngest siblings were taken to a foster care facility. Jane 1 asked Aaron and Susan if she could live with them, and they agreed. At the time of trial, all four siblings were living with their grandmother and other family members (but not their father or mother) at their grandmother's home.

B.  *Defense Case*

Oliva testified he joined the Marines in August 2004 shortly after he turned 18. He met Welch the following year when she was pregnant with Jane 3. They were married in 2006 and moved into base housing at Camp Pendleton. They moved to North Carolina in 2010 after he was transferred there, and returned to Oceanside in March 2012 after he was honorably discharged.

Oliva testified he was innocent. He admitted he would wrestle with Jane 1, Jane 2, and John, but only because they were getting bullied at school and he was "trying to teach them skills." He taught the children how to get out of a chokehold, or how to block punches, while they wore headgear and boxing gloves. They enjoyed the wrestling and boxing sessions most of the time. When they were tired or did not want to participate, he would "try and get them motivated because . . . you don't always get to choose when a fight happens."

Oliva testified he never choked John. He tried to teach John to get out of a chokehold. Sometimes John would hold his own breath and struggle because "he didn't want to do it." Oliva denied throwing John onto the couch.

15

John received a puncture wound from being stabbed by a pencil in school. John only broke his arm once, while riding a skateboard.

When the family drove across the country to North Carolina, it was Welch who drove the U-Haul truck; Oliva did not drive it. Oliva explained Welch had experience driving moving trucks, but he was not very comfortable driving a moving truck.

In 2017, Welch discovered that Oliva had been unfaithful. The children "kind of shunned [him]" when they found out. Oliva said the children's allegations were coming from "out of nowhere." He thought the children were "making this up" because they were upset at him for cheating on their mother, they wanted him out of their lives, and they wanted to live at their grandmother's house. At one point, Jane 2 told him she did not like him, and she was the leader of the siblings. And Jane 3 was "incredibly believable or persuasive." One time, after he heard her cursing at her sister, she denied that she had done it.

Welch received a call from Susan, and Oliva overheard Welch say, " What are you talking about? That didn't happen. " After the call ended, Welch left to go to Susan's house. Welch called him later crying hysterically and told him the children were in the back of police cars and they would not let her speak to them. Oliva moved out of their home that day because he "figured it was best for her and the family if [he] wasn't there." He had told the detective he moved out because of the "stress of living with [Welch's] family" and because he and Welch "just kind of grew apart."

In his closing argument, defense counsel told the jury that all four victims had lied about being abused. They had "sprinkle[d] in some truth with the lies" but their "[l]ate disclosure does not equal the truth." Counsel argued the siblings had a motive to lie because they were angry, wanted

16

sympathy, and wanted to live with Susan and Aaron, or somewhere other than the home they shared with their mother and Oliva. They got together and decided to lie about Oliva and came up with "provocative allegations to be able to get where they wanted to go." They would do anything to escape poverty. (Oliva had testified the house where the family was living was very small and in an unsafe neighborhood.) And the younger children had lied to please Jane 2. Counsel argued there were inconsistencies in the siblings' testimony about the way John had broken his arm, whether Jane 1 and Jane 2 had engaged in "threesomes" with Oliva, and the date they originally disclosed Oliva's abuse. Counsel argued the inconsistent statements indicated they were lying about being abused. Oliva, in contrast, was a credible witness. He had stayed in San Diego despite knowing he was being investigated for sex abuse, which was the behavior of an innocent person.

DISCUSSION

I.

*The Trial Court Did Not Prejudicially Err in Admitting*
*Expert Testimony About Child Sexual Abuse*

A.    *Additional Background*

Albert Killen-Harvey is a licensed clinical social worker whose professional work is focused on child trauma. At the time of trial, he had been employed by the Chadwick Center at Rady Children's Hospital for over 20 years as a clinician, clinical supervisor, and coordinator of services. His current position at the Chadwick Center involved training law enforcement and medical professionals about child sexual abuse.

Killen-Harvey testified in general terms about common myths and misconceptions about child sexual abuse and the victims of child sexual

17

abuse.[7]  He explained to the jury he had received no information about Oliva's case and did not meet with the alleged victims.  His testimony was based on research in the field and on his experience as a clinician.  He told the jury he was not "trying to make a case on one side or another."

Killen-Harvey explained that common myths about sex abuse include the misconception that it only happens between a child and a stranger, or that if somebody was harming a child, the "child would just invariably tell somebody."  Another misconception is that children who are victimized are alone and have no family connection.  In reality, most children know their offender.  Children often are not able to walk away from their abuser, and so abuse can occur over a long period of time.  Children can also be groomed by someone they love and trust to accept and become accustomed to abuse.  If they have a relationship with the abuser, they may value that relationship over disclosing the abuse.  Based on Killen-Harvey's experience and knowledge of the literature, it is "highly unusual" that abuse is a one-time event.  He could not remember a case in which the sexual assault or violation happened only once.

Contrary to common assumptions, the majority of children do not disclose abuse right away, and some never disclose they were abused.  People tend to disclose trauma incrementally rather than all at once.  Children sometimes falsely deny they were abused.  Family support is a major factor

---

[7]    Killen-Harvey's testimony was not explicitly about child sexual abuse accommodation syndrome (CSAAS), but his opinions were consistent with CSAAS research.  (See *People v. Bowker* (1988) 203 Cal.App.3d 385, 389 & fn. 3 (*Bowker*) [first articulated in 1983, CSAAS has five stages—secrecy, helplessness, entrapment and accommodation, delayed disclosure, and retraction].)

18

that plays into a child's decision to disclose. If a parent is dismissive when a child reports abuse, the child becomes less likely to disclose again for fear of being discounted. Children are less likely to disclose abuse to a stranger, even if the stranger is a "helping professional." There is no one way for a child to react to abuse.

There is a misconception that an abused child will be able to recall every detail of the abuse. In reality, children tend to recall core details of a traumatic event and may not retain peripheral, or less significant, details, especially when abuse is consistent over a long period of time. Law enforcement personnel are trained not to ask questions repeatedly so as to avoid confusing the child. Children who do disclose abuse may hold back details out of shame, or to protect themselves from retribution or from their own emotions about the trauma.

B.    *Oliva's Claim of Error*

Oliva challenges the admission of the following statements made by Killen-Harvey in the course of his direct examination: (1) "the vast majority of children actually know their offender, it is somebody they are in a relationship with, whether that's family or within their community"; (2) that it is the "minority of cases in which a disclosure is made immediately"; (3) that inconsistent statements are common; (4) that false denials of child abuse are not "common," but "not unusual," and happen "on a frequent enough basis"; and (5) "it is highly unusual that the situation or report that we're dealing with or circumstances we're dealing with is a onetime event."

Oliva argues this testimony amounted to " 'predictive conclusions' " and was inadmissible under *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*), *People v. Wilson* (2019) 33 Cal.App.5th 559 (*Wilson*), and *People v. Lapenias* (2021) 67 Cal.App.5th 162 (*Lapenias*), and that the evidentiary error was

19

prejudicial. *Julian* and *Wilson* held it is an abuse of discretion for a court to permit an expert on child sexual abuse to testify about the statistical percentages of false allegations by child sexual abuse victims. (*Julian*, at pp. 883–884 [expert testified there were "a 'dozen studies' that supported a 'one to six percent' false allegation rate"]; *Wilson*, at p. 568 [same expert and same testimony].) *Lapenias*, relying on *Julian* and *Wilson*, held it was error to admit expert testimony that it was " 'rare' for children to make false allegations of sexual abuse." (*Lapenias*, at p. 179.)

We first reject the People's contention that Oliva forfeited his challenge by failing to interpose contemporaneous objections to Killen-Harvey's testimony, or by failing to present argument on each of Killen-Harvey's assertions in his motion in limine. Oliva moved to exclude statistical probability testimony from Killen-Harvey under *Julian* and *Wilson*, and at trial was granted a continuing objection to his "entire testimony" based on the arguments and authorities in his motion in limine. Oliva "adequately alerted the court to the basis of [his] objection" to Killen-Harvey's testimony, which was "sufficient to preserve the issue for review." (*People v. Stamps* (2016) 3 Cal.App.5th 988, 993, disapproved on another ground in *People v. Veamatahau* (2020) 9 Cal.5th 16, 31, fn.4.)

We review Oliva's claim of error for abuse of discretion: "the decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 (*McAlpin*).) We conclude the testimony challenged by Oliva is unlike the testimony held inadmissible in *Julian*, *Wilson*, and *Lapenias*, and that the trial court did not abuse its discretion in admitting it. We further conclude the admission of the testimony, even if erroneous, was not prejudicial.

C.    *Analysis*

Expert testimony to explain the behavior of child abuse victims, often known as CSAAS evidence, has long been held admissible in California for limited purposes:  "[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation."  (*McAlpin, supra,* 53 Cal.3d at p. 1300; see *People v. Munch* (2020) 52 Cal.App.5th 464, 468 ["CSAAS evidence has been admitted by the courts of this state since the 1991 *McAlpin* decision."].)  " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' "  (*McAlpin*, at p. 1301.)

Even so, the admissibility of such evidence is subject to certain recognized limits.  Such evidence "is not admissible to prove that the complaining witness has in fact been sexually abused."  (*McAlpin, supra*, 53 Cal.3d at p. 1300.)  " 'The expert is not allowed to give an opinion on whether a witness is telling the truth[.]' "  (*Julian, supra*, 34 Cal.App.5th at p. 885.)

Nor may an expert present " 'predictive conclusions.' "  (*Julian, supra*, 34 Cal.App.5th at p. 886, quoting *Bowker, supra*, 203 Cal.App.3d at p. 393.)  The expert may not give " 'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused."  (*Bowker*, at p. 393.)  "It is one thing to say that child abuse victims often exhibit a certain characteristic or that a particular behavior is not inconsistent with a child

21

having been molested.  It is quite another to conclude that where a child meets certain criteria, we can predict with a reasonable degree of certainty that he or she has been abused.  The former may be appropriate in some circumstances; the latter—given the current state of scientific knowledge—clearly is not." (*Ibid.*)  To ensure the jury does not misuse expert testimony about CSAAS, "at a minimum the [CSAAS] evidence must be targeted to a specific 'myth' or 'misconception' suggested by the evidence." (*Id.* at pp. 393–394.)  The jury must also be instructed "that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Id.* at p. 394.)

Here, Oliva argues portions of Killen-Harvey's testimony were inadmissible under *Julian*, *Wilson*, and *Lapenias*.  In *Julian*, the prosecution's expert witness was permitted to testify the " 'range of false allegations that are known to law enforcement or [Child Protective Services] . . . is about as low as one percent of cases to a high of maybe 6, 7, 8 percent of cases that appear to be false allegations.' " (*Julian*, *supra*, 34 Cal.App.5th at p. 883, italics omitted.)  He was extensively examined about the percentages of false allegations reported in various studies. (*Id.* at pp. 883–884.)  The Court of Appeal held it was error to admit this testimony. (*Id.* at p. 885.)  It observed that under *People v. Collins* (1968) 68 Cal.2d 319, expert opinions on the statistical probability of guilt tend to "distract[ ]" the jury from its " 'requisite function of weighing the evidence on the issue of guilt." (*Julian*, at p. 886, quoting *Collins*, at p. 327; see *Collins*, at pp. 325–327 [prejudicially erroneous to permit a mathematics expert to testify, based on assumed characteristics of the perpetrators, there was "but one chance in 12 million that defendants were innocent"].)  It canvassed decisions from other jurisdictions prohibiting the use of statistics to quantify the percentage

of children reporting sex abuse who are telling the truth. (*Julian*, at pp. 886–887.) The court held the prosecution expert's "92 to 99 percent [statistical] probability evidence invited jurors to presume [the defendant] was guilty based on statistical probabilities" and deprived the defendant of his right to a fair trial. (*Id.* at p. 886.)

*Wilson* involved the admission of virtually identical testimony from the same CSAAS expert in another child sex abuse case. At trial, the prosecutor asked the expert about false allegations of sex abuse, and he testified about a " 'classic' " study that found " 'about 4% of cases in which there was an allegation that was determined to be false.' " (*Wilson*, *supra*, 33 Cal.App.5th at p. 568.) The expert also testified "there were 12 to 15 other studies on the subject, which found false allegations in between 1 and 6 percent of cases." (*Ibid.*) The *Wilson* court, relying on decisions of other states, federal courts, and military courts, held the numerical evidence provided by the expert was inadmissible. (*Id.* at pp. 568–570.) The expert's testimony "had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth" and suggested to the jury there was an "overwhelming likelihood [the victims'] testimony was truthful." (*Id.* at p. 570.) "[T]his invaded the province of the jury in assessing a complaining witness's credibility." (*Id.* at p. 568.)

In *Lapenias*, Division Three of the Fourth Appellate District, applying *Julian* and *Wilson*, held testimony from a CSAAS expert "that it is 'rare' for children to make false allegations of sexual abuse" was inadmissible. (*Lapenias*, *supra*, 67 Cal.App.5th at p. 179.) This "testimony—by implication and by inference—violated the general rule that an expert may not give an opinion as to whether another witness is telling the truth or the defendant is guilty." (*Ibid.*) It went beyond the limited purpose of CSAAS testimony "to

explain the typical behaviors of sexually abused children, such as delayed reporting" and " ' "addressed whether children who claimed to be sexually assaulted lie." ' " (*Ibid.*) The court rejected the People's claim that *Julian* and *Wilson* were distinguishable, reasoning there was " 'no meaningful distinction between giving a statistic that indicates that false allegations are rare and stating that children rarely make false allegations without explicitly quantifying the word "rare." ' " (*Lapenias*, at pp. 179–180.)

We disagree that the challenged portions of Killen-Harvey's testimony fall within the principles articulated in *Julian*, *Wilson*, or *Lapenias*. In *Julian* and *Wilson*, the expert provided quantitative data about the low percentages of false allegations of sexual abuse, effectively conveying to the jury that extremely high percentages of children—between 92 and 99 percent (*Julian*) or 94 and 99 percent (*Wilson*)—who report sexual abuse are telling the truth. Here, Killen-Harvey did not present data from which the jury could infer an overwhelming percentage of child accusers tell the truth. And although in *Lapenias*, the court found *Julian* and *Wilson* applied even though the challenged testimony was qualitative, not quantitative (the expert said "it is 'rare' for children to make false allegations of sexual abuse" (*Lapenias*, *supra*, 67 Cal.App.5th at p. 179)), here, the testimony Oliva challenges did not address the frequency of false allegations of sexual abuse. Killen-Harvey's testimony is distinguishable from the testimony found inadmissible in *Julian*, *Wilson*, and *Lapenias*.

To the extent Oliva is effectively asking us to extend *Julian*, *Wilson*, and *Lapenias* and find they render Killen-Harvey's testimony inadmissible even though he did not testify about the low prevalence of false allegations of sex abuse, we decline to do so. Oliva contends Killen-Harvey's descriptions of patterns of behavior in sexually abused children improperly bolstered the

victim witnesses' credibility and thereby invaded the province of the jury. But the very purpose of expert testimony about the behavior of child sex abuse victims *is* to assist the jury in evaluating the credibility of the complaining witnesses. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1302–1304.)

Most of the testimony Oliva challenges fell within the scope of expert testimony that has been deemed admissible in *McAlpin* and other cases. Killen-Harvey's testimony that "the vast majority of children actually know their offender" and the offender "is somebody they are in a relationship with" was offered in response to the prosecutor's question whether there exists a typical profile that society has a tendency to picture when thinking of a child molester. Killen-Harvey explained, based on his experience training professionals about sex abuse, that "we still have in our culture" the idea that a child molester is a "stranger," and then, in the testimony Oliva challenges, sought to counter this misconception. Testimony on this topic was held admissible in *McAlpin*. (See *McAlpin*, *supra*, 53 Cal.3d at pp. 1302–1303 [one of the popular notions that requires correction is that " '[t]he layperson imagines the child offender' " to fit particular stereotypes, including that the offender is " 'a stranger' "].)

The same is true of Killen-Harvey's testimony about immediate disclosure of sex abuse, and inconsistent statements and false denials from abuse victims. These topics have been held by other courts to be within the scope of permissible expert testimony about CSAAS. (See, e.g., *People v. Sanchez* (1989) 208 Cal.App.3d 721, 734 ["delayed conflicted disclosure" is a symptom and characteristic of CSAAS], cited with approval in *McAlpin*, *supra*, 53 Cal.3d at p. 1301, fn. 4; *People v. Stark* (1989) 213 Cal.App.3d 107, 117 [CSAAS expert testimony admissible to explain "concealment" by the alleged victim and "any conflict" in the alleged victim's testimony], cited with

25

approval in *McAlpin*, at p. 1301, fn. 4; *People v. Housley*, 6 Cal.App.4th 947, 954–956 [expert testimony that "victims commonly and falsely recant their stories of abuse" admissible to explain victim's recantation].) Although Killen-Harvey did not expressly identify a syndrome, his testimony was about the behavior, in general, of children who have been sexually abused, such that the case law regarding the admissibility of CSAAS evidence applies. (See footnote 7, *ante*.)

And while Killen-Harvey used qualitative phrases to describe these patterns of behavior (e.g., that "the vast majority of children" know their abuser; it is "the minority of cases" in which disclosure is immediate; false denials are not "common . . . but not unusual"; and that victims have a "limited capacity" to tell the same story "every single time"), his use of these phrases merely served to inform the jury of the extent to which the behavior he was describing was typical of sexually abused children. (See *Lapenias*, *supra*, 67 Cal.App.5th at p. 179 [acknowledging the purpose of CSAAS testimony is "to explain the typical behaviors of sexually abused children"].) This testimony did not suggest there was an "overwhelming likelihood" Jane 1, Jane 2, or Jane 3 were truthful (*Wilson*, *supra*, 33 Cal.App.5th at p. 570), did not appear to vouch for their credibility (*Lapenias*, at p. 180), and did not effectively tell the jury that a child who meets the described criteria has been abused (*Bowker*, *supra*, 203 Cal.App.3d at p. 393).

Killen-Harvey's testimony that it "is highly unusual that the situation or report that we're dealing with . . . is a onetime event" is not a topic of testimony specifically authorized by the case law of which we are aware. Even so, it did not violate the principles cited by Oliva. This testimony did not describe the infrequency of false allegations of abuse or suggest it was overwhelmingly likely Jane 1, Jane 2, and Jane 3 were truthful witnesses.

26

(Cf. *Julian*, *supra*, 34 Cal.App.5th at p. 886; *Wilson*, *supra*, 33 Cal.App.5th at p. 570; *Lapenias*, *supra*, 67 Cal.App.5th at p. 179.)  Nor did it amount to a predictive conclusion.  A predictive conclusion has been described as " 'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused"—or, stated slightly differently, is testimony "that where a child meets certain criteria, we can predict with a reasonable degree of certainty that he or she has been abused." (*Bowker*, *supra*, 203 Cal.App.3d at p. 393.)  Here, no party claimed any of the children were abused just once.  Jane 1, Jane 2, and Jane 3 testified to a pattern of multiple sexual assaults over varying periods of time.  Oliva denied there had been any abuse at all.  The jury could not apply Killen-Harvey's testimony about a "onetime event" to the facts of this case and conclude the sisters were sexually abused.

For all of these reasons, Oliva's contention that Killen-Harvey's testimony was inadmissible under principles articulated in *Julian*, *Wilson*, and *Lapenias* lacks merit.  He fails to establish that the trial court's evidentiary ruling constituted an abuse of discretion.  But even if we were to conclude the court erred in admitting the challenged testimony, we would not find the error prejudicial.

Oliva argues the admission of Killen-Harvey's testimony violated his federal constitutional rights to due process, a fair trial, and to a conviction based on properly admitted evidence, such that we must assess the harm resulting from the error under the test set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).  That contention has already been rejected.  In *Wilson*, the defendant also argued the erroneous admission of statistical evidence violated his federal constitutional rights and advocated that the

27

prejudicial effect of the error had to be evaluated under *Chapman*. (*Wilson*, *supra*, 33 Cal.App.5th at p. 571.) The Court of Appeal disagreed: "In similar situations, . . . our high court has applied instead the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 [(*Watson*)], under which we reverse only if it is reasonably probable the defendant would have reached a more favorable result in the absence of the error." (*Ibid*., citing *People v. Bledsoe* (1984) 36 Cal.3d 236, 251–252.) We, like the *Wilson* court, will evaluate the prejudice flowing from the allegedly evidentiary error under the *Watson* standard.

Applying the *Watson* standard, we conclude any error flowing from admission of the challenged testimony was not prejudicial. Killen-Harvey made clear he had no information about the case and had not met the alleged victims. He told the jury his purpose in appearing as a witness was "not . . . to be the juror or to be siding on either side of the case." The testimony Oliva challenges amounted to brief assertions within a direct examination that encompassed 33 pages of the trial transcript, unlike *Julian*, in which the jury was "bombarded" with expert testimony about statistical studies. (*Julian*, *supra*, 34 Cal.App.5th at p. 888.) All of the victims testified, as did Oliva, and the jury had the opportunity to evaluate their credibility as witnesses.

Most of the testimony Oliva challenges on appeal was not relied on by the prosecutor in closing argument. The prosecutor did refer to Killen-Harvey's statement that false denials are not uncommon, but she did so just once, and only briefly. The court instructed the jury with a modified version of CALCRIM No. 1193 that told the jury: "Albert Killen-Harvey's testimony about child sexual abuse is not evidence that the defendant committed any of the crimes charged against him." And, "You may consider this evidence only in deciding whether or not the conduct of [Jane 1, Jane 2, and Jane 3] was not inconsistent with the conduct of someone who has been molested, and in

28

evaluating the believability of their testimony." The jury was also instructed they were the sole judges of "the credibility or believability of the witnesses" (CALCRIM No. 226) and they were not required to accept expert opinions (CALCRIM No. 332). "We presume the jurors understood and followed the instructions." (*Lapenias*, *supra*, 67 Cal.App.5th at p. 180.)

Oliva points out that the jury sought a readback of Jane 1 and Jane 2's testimony about " 'threesomes.' " He asserts their testimony on this topic was conflicting and argues this supports a finding Killen-Harvey's opinions were prejudicial. Not so. In response to the readback request, the trial court ordered the entire testimony of Jane 1 and Jane 2 to be read to the jury. The jury did not seek a readback of Killen-Harvey's testimony. Though there were inconsistencies in the testimony of Jane 1 and Jane 2, in the main, their accounts of Oliva's pattern of sexual abuse were mutually corroborative, and they were also corroborated by other witnesses. Jane 1 and Jane 2 described similar patterns of abuse escalating from forced oral copulation to regular sexual penetration at the family home and in vehicles that Oliva drove to remote parking lots. Jane 2 testified she saw Oliva take Jane 1 into his bedroom. Jane 1 and Jane 3 described similar experiences of being blindfolded by Oliva for forcible oral copulation. Aaron described the appearance and emotionality of Jane 1 and Jane 2 when they disclosed the abuse, allowing the jury to assess whether they were truthful in relating their experiences. Welch's behavior following the disclosure, as reported by Aaron and Susan, was consistent with Jane 1 and Jane 2's testimony that Welch did not protect them from Oliva or take their complaints seriously.

On this record, we have no difficulty concluding it is not reasonably probable Oliva would have reached a more favorable result absent the alleged

29

error in admitting the challenged portions of Killen-Harvey's testimony. (*Watson, supra*, 46 Cal.2d at p. 836.)

II.

*Oliva's Jurisdictional Challenge to His Conviction on Counts 3 and 4 Fails*

A.      *Oliva's Contentions*

Oliva contends his conviction on counts 3 and 4 must be vacated because the verdicts on these counts "likely" included acts over which the trial court had no territorial jurisdiction.[8]  Counts 3 and 4 charged Oliva with forcible lewd acts against Jane 1 when she was under the age of 14 years, between September 9, 2010 and July 4, 2013.  (§ 288, subd. (b)(1).) These acts were described as sexual contact involving Oliva forcing Jane 1's mouth onto his penis.  Count 3 specified the offense conduct involved placing Jane 1's "mouth onto D's crotch area [first time]."  Count 4 alleged the offense was committed by placing Jane 1's "mouth onto D's crotch area [last time]." The amended information alleged the charged offenses were committed in San Diego County.  The jury was instructed pursuant to CALCRIM No. 3501 on unanimity based on generic testimony of abuse.[9]  The jury returned

---

[8]      Oliva only challenges his convictions on counts 3 and 4.  He does not contend the jury's verdicts on the other counts likely relied on acts outside the territorial jurisdiction of the court.

[9]      "Defendant Daniel Oliva is charged with forcible lewd act upon child; forcible oral copulation; forcible rape; and oral copulation with child 10 years old or younger sometime during the period of July 4, 2007 to October 31, 2017. . . .

"The People have presented evidence of more than one act to prove that the defendant[ ] committed these offenses.  You must not find the defendant guilty unless:

30

verdicts of guilty on counts 3 and 4, finding the underlying acts occurred "on or about and between September 9, 2010 and July 4, 2013."

On appeal, Oliva argues the convictions on counts 3 and 4 must be vacated because the jury's verdicts "likely included acts over which the trial court had no jurisdiction." (Capitalization omitted.) Oliva's arguments in support of his position are somewhat difficult to characterize. He asserts the time span alleged in counts 3 and 4 of the amended information covers a period of time (September 2010 through March 2012) when it is undisputed Jane 1 did not reside in California. He further asserts the trial court did not have territorial jurisdiction over the acts of oral copulation committed during that period, and the jury "necessarily had no authority to find [him] guilty of acts which occurred outside the State's territorial jurisdiction." He spends a considerable portion of his brief arguing that the three statutes that extend California's territorial jurisdiction to extraterritorial acts (sections 27, 778 and 778a) do not apply to the incidents of oral copulation that occurred in Texas and North Carolina. He contends it is "highly likely" the jury's verdicts "included those acts."

He then argues that the prosecutor's closing argument and CALCRIM No. 3501 on unanimity "did not cure the error." (Italics omitted.) He claims the prosecutor's statement that counts 3 and 4 related to " 'the [oral

---

"1.    You all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed for each offense;

"OR

"2.    You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during this time period and have proved that the defendant committed at least the number of offenses charged."

31

copulations] that [Jane 1] described when she was under the age of 14' "
implied the oral copulations committed in Texas and North Carolina were
included in the charges.  He argues the unanimity instruction, which covered
the period July 4, 2007 to October 31, 2017, "effectively told the jury it could
consider [oral copulations] which occurred outside California," and that "[t]he
verdicts specifically state the jury found appellant guilty based on acts
occurring 'on or about and between September 9, 2010 and July 4, 2013.' "
He contends the jury "easily could have relied on the Texas act as the basis
for one verdict" because Jane 1 described it in detail, and the jury "likely"
found the specificity persuasive.  He concludes "it cannot be said there is
substantial evidence from which to conclude the verdicts on counts 3 and 4 do
not include acts . . . over which the trial court had no jurisdiction."

As we explain, Oliva's contentions lack merit.

B.     *Analysis*

"Territorial jurisdiction establishes the court's authority to try the
defendant[.]"  (*People v. Betts* (2005) 34 Cal.4th 1039, 1050 (*Betts*).)  In
California, territorial jurisdiction over criminal acts is defined by statute.
(*Fortner v. Superior Court* (2013) 217 Cal.App.4th 1360, 1364 (*Fortner*).)
"The general rule of territorial jurisdiction over felonies is . . . stated in
section 777:  'except as otherwise provided by law the jurisdiction of every
public offense is in any competent court within the jurisdictional territory of
which it is committed.' "  (*Price v. Superior Court* (2001) 25 Cal.4th 1046,
1055.)  Section 27 "generally permits the punishment of a defendant under
California law for any crime committed 'in whole or in part' in the state."

(*Betts*, at p. 1047; § 27, subd. (a)(1).[10]) Under section 778, California has jurisdiction over crimes commenced outside the state but consummated within it.[11] Under section 778a, subdivision (a),[12] "California has territorial jurisdiction over an offense if the defendant, with the requisite intent, does a preparatory act in California that is more than a de minimis act toward the eventual completion of the offense." (*Betts,* at p. 1047.)

If a superior court lacks territorial jurisdiction over an offense, it "has no authority to act in the matter and cannot enter judgment either in favor of or against the defendant." (*Betts*, *supra*, 34 Cal.4th at p. 1050.) However, "the absence of territorial jurisdiction does not signify the defendant is not culpable." (*Ibid.*) "Thus, if it appears, after a jury has been empaneled, that a court is without jurisdiction to try the defendant, the court is directed by statute to discharge the jury and the defendant [citations], not to enter judgment in the defendant's favor." (*Ibid.*)

---

[10]    "All persons who commit, in whole or in part, any crime within this state" are "liable to punishment under the laws of this state." (§ 27, subd. (a)(1).)

[11]    "When the commission of a public offense, commenced without the State, is consummated within its boundaries by a defendant, himself outside the State, through the intervention of an innocent or guilty agent or any other means proceeding directly from said defendant, he is liable to punishment therefor in this State in any competent court within the jurisdictional territory of which the offense is consummated." (§ 778.)

[12]    "Whenever a person, with intent to commit a crime, does any act within this state in execution or part execution of that intent, which culminates in the commission of a crime, either within or without this state, the person is punishable for that crime in this state in the same manner as if the crime had been committed entirely within this state." (§ 778a, subd. (a).)

Several matters relevant to our consideration of Oliva's claim are not in dispute. The parties agree the date range in counts 3 and 4 of the amended information ("[o]n or about and between September 9, 2010 and July 4, 2013") charging Oliva with forcible lewd act on a child under 14 encompassed a period when Jane 1 and Oliva were living outside California (2010 until March 2012) and a period when they were living in California (March 2012 to July 4, 2013). At all times alleged in counts 3 and 4, Jane 1 was under 14 years old. The parties also agree Jane 1 testified to multiple acts of forcible oral copulation in Texas, including the sexual assault in the U-Haul truck, and North Carolina between 2010 and March 2012.[13] She also testified after the family returned to Oceanside in March 2012, Oliva continued to put his penis in her mouth, and that this occurred more than once when she was in seventh grade and 13 years old, between March 2012 and July 4, 2013. The parties also agree that sections 27, subdivision (a)(1), 778, and 778a, subdivision (a), did not confer the superior court with jurisdiction over any acts of forcible oral copulation committed in Texas and North Carolina.

Where the parties diverge is in describing the procedural point at which the alleged jurisdictional error occurred. Questions of territorial jurisdiction are decided by the trial court, not the jury. (*Betts*, *supra*, 34 Cal.4th at p. 1054 [no right to jury trial on factual questions that establish jurisdiction].) " '[A] challenge to a court's fundamental subject matter

_____

[13] Evidence of these uncharged crimes was admitted pursuant to Evidence Code section 1108, over the defense objection they were subject to exclusion under Evidence Code section 352 and would violate his federal and state constitutional rights of due process, fair trial, confrontation, cross-examination, and presentation of evidence. The jury was instructed under CALCRIM No. 1191A on the use of evidence of uncharged sex offenses. Oliva does not challenge the admission of this evidence.

34

jurisdiction strikes at the very foundation of the court's authority *and therefore should be determined pretrial by the court as a matter of law*." (*Id.* at p. 1051, italics added.) "The existence of territorial jurisdiction may [also] be 'decided by the trial court on a motion for entry of a judgment of acquittal pursuant to section 1118.1.' " (*People v. Joseph* (2021) 63 Cal.App.5th 1058, 1068, quoting *Betts*, at p. 1048.)

Oliva does not clearly specify when he contends the alleged error was committed. He contends the trial court "could not pronounce judgment" on acts occurring in Texas or North Carolina, and "the jury's verdict" could not be based on such acts. As the People point out, however, jurisdiction is a question to be addressed by the trial court. Oliva concedes the trial court was not presented with a motion or objection that counts 3 and 4 of the amended information encompassed conduct outside its territorial jurisdiction.[14] At the same time, he cites *Fortner*, *supra*, 217 Cal.App.4th at page 1364, for the proposition that our review is for substantial evidence. In *Fortner*, the defendant sought writ relief after the superior court overruled his demurrer and denied his motion to dismiss offenses committed in Hawaii on jurisdictional grounds. (*Id.* at pp. 1362–1363.) The appellate court "defer[red] to the superior court's factual findings" but ultimately concluded

_____

[14] The amended information originally included counts 1 and 2 charging Oliva with oral copulation with a child 10 years old or younger, committed against Jane 1 at Camp Pendleton between July 4, 2007 and July 4, 2009. Before the jury was empaneled, the court granted the prosecutor's unopposed motion to dismiss these counts for lack of territorial jurisdiction on the ground Camp Pendleton is a federal enclave subject to exclusive federal criminal jurisdiction. Neither the prosecution nor the defense moved to amend the date range alleged in counts 3 and 4 and no objection was raised that counts 3 and 4 encompassed acts occurring outside San Diego County.

there was no evidence to support them. (*Id.* at pp. 1363–1367; cf. *Betts*, *supra*, 34 Cal.4th at p. 1055 ["We will uphold a trial court's determination on factual issues if supported by substantial evidence and review its legal determinations independently."].)

Here, unlike *Fortner*, no pretrial or posttrial jurisdictional challenge was filed, and consequently there are no factual findings, express or implied, to review for substantial evidence. Moreover, although Oliva advocates for substantial evidence review, his asserted lack of substantial evidence arguments focus in large part on the CALCRIM No. 3501 unanimity instruction, which is not evidence. His arguments are less like substantial evidence arguments and more like the arguments parties generally advance to establish the prejudice of an alleged error.

The People contend Oliva's appellate challenge more nearly resembles a claim that the CALCRIM No. 3501 unanimity instruction, which told the jury Oliva was charged with offenses committed between July 4, 2007 to October 31, 2017, likely misled the jurors to convict him based on acts of forced oral copulation that occurred outside California. We agree with this interpretation of Oliva's appellate challenge. It fits the procedural posture of this case: no party alerted the trial court to the overbreadth in the date range alleged in counts 3 and 4 of the amended information; the case proceeded to trial; and the jury rendered a verdict of guilty on counts 3 and 4. It also fits the thrust of Oliva's arguments: he contends neither the verdict nor the resulting judgment could rest on extraterritorial acts; he relies on the date range in the unanimity instruction and, correspondingly, in the verdict form, to support his position the jury based its verdict on forcible oral copulations that occurred outside California. Moreover, although Oliva filed

a reply brief on appeal, he did not dispute the People's characterization of his position.

We agree with the People that Oliva's appellate challenge is properly construed as a challenge to the unanimity instruction. However, we disagree with the People's contention this challenge has been forfeited. "A claim of fundamental jurisdictional defect is not subject to forfeiture or waiver." (*People v. Hoyt* (2020) 8 Cal.5th 892, 911.) "We are therefore obligated to address the claim." (*Ibid.*) Pursuant to *Betts*, an appellate court reviews the factual issues pertinent to territorial jurisdiction for substantial evidence and reviews the relevant legal issues independently. (*Betts*, *supra*, 34 Cal.4th at p. 1055; see *People v. Posey* (2004) 32 Cal.4th 193, 218 [independent standard of review applies when assessing alleged error in a jury instruction].)

Here, the unanimity instruction stated, in relevant part: "Defendant Daniel Oliva is charged with forcible lewd act upon child; forcible oral copulation; forcible rape; and oral copulation with child 10 years old or younger sometime *during the period of July 4, 2007 to October 31, 2017*." (Italics added.) The question is whether this date range was susceptible to the interpretation that Oliva was criminally liable for acts of forcible oral copulation outside the territorial jurisdiction of the superior court. As we have noted, the parties do not dispute the acts of forcible oral copulation described by Jane 1 as having occurred in Texas and North Carolina were committed between 2010 and March 2012. And the People concede the relevant jurisdictional statutes did not give the superior court jurisdiction over these offenses. We agree. No evidence was presented that any part of the Texas or North Carolina incidents, including consummation of the offenses or formation of the intent to commit the offenses, was committed in California. (Cf. §§ 27, subd. (a)(1), 778, 778a, subd. (a).) Thus, the date range

in the instruction was overbroad, because it encompassed dates when Oliva committed acts of forcible oral copulation that were not within the territorial jurisdiction of the superior court.

The next question is whether this error in the instruction was prejudicial. Oliva does not identify a standard for assessing harmlessness. The People argue any error in the instruction was harmless under *Watson* or *Chapman*. We will apply the *Chapman* standard, under which "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 13 (*Aledamat*).)

*Chapman* is the test that applies when appellate courts consider the harmlessness of alternative-theory instructional error—that is, instructing the jury on two theories of guilt, one valid and one invalid—where one of the alternate theories violates the federal constitution. (See *Aledamat, supra,* 8 Cal.5th at pp. 9–13; *Betts*, *supra*, 34 Cal.4th at p. 1046 [discussing constitutional limits of state court exercise of jurisdiction in criminal matters].) The overbreadth in the unanimity instruction here is an analogous form of instructional error because it permitted the jury to reach a verdict on grounds that were legally permissible (i.e., based on offenses within the territorial jurisdiction of the superior court) and legally impermissible (i.e., based on offenses outside the court's territorial jurisdiction). The *Chapman* standard for determining harmless error is "more stringent" than the *Watson* standard. (See *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1179.) If the overbreadth in the instruction was harmless beyond a reasonable doubt, it was necessarily harmless under *Watson*.

Applying the *Chapman* standard here, we conclude the instructional error was harmless beyond a reasonable doubt. We agree with Oliva that to the extent the date range in the unanimity instruction was overly broad such that it encompassed acts of forcible oral copulation committed in Texas and North Carolina as well as acts of forcible oral copulation committed after the family returned to California, the language of the general verdicts on counts 3 and 4 did not cure the error. The verdicts on counts 3 and 4 stated the jury found Oliva guilty of violating section 288, subdivision (b)(1), "on or about and between September 9, 2010 and July 4, 2013, as charged in [Count Three/Count Four] of the Amended Information." As Oliva has urged, this date range, like the date range in the unanimity instruction, included the period when Jane 1 and Oliva were in Texas and North Carolina, as well as the period after they returned to California when Jane 1 was still under 14.

But other circumstances support the conclusion the instructional error was harmless. The prosecutor told the jury all charges against Oliva were based on conduct committed in Oceanside. (See *Aledamat*, *supra*, 8 Cal.5th at p. 14 [considering arguments of counsel in assessing harmlessness of instructional error].) In walking the jury through the evidence supporting counts 3 and 4, the prosecutor repeatedly emphasized the acts of forcible oral copulation that were committed in Oceanside. The prosecutor told the jury the evidence supporting Oliva's conviction on these counts was Jane 1's testimony about "[o]ral sex, [oral copulation], more than once in the seventh grade" and told the jury "she said it was more than one time, at least in the seventh grade." The prosecutor repeatedly told the jury that Jane 1 was 13 years old at the time of the first charged act (i.e., count 3). Referring to the section 288, subdivision (b)(1), requirement that the victim must be under 14, the prosecutor stated, "in the seventh grade, [Jane 1] would have been 13

39

years old. . . . And when she says more than once in the seventh grade, she was under 14. [¶] Because of that, members of the jury, . . . we know that counts 3 and 4 have been met." The jury was repeatedly made aware of the prosecutor's factual basis for counts 3 and 4.

The evidence in the record, coupled with the jury's verdicts, further support a finding of harmless error. At trial, Jane 1 testified she was sexually abused by Oliva for 10 years, and that the abuse consisted of forcible oral copulation and sexual intercourse. She testified she was forced to orally copulate Oliva in Texas and North Carolina, and that Oliva continued to force her to orally copulate him after March 2012 when the family settled in Oceanside, on multiple occasions when she was under 14 years old and when she was over 14 years old. She also testified that Oliva started vaginally penetrating her in North Carolina, and continued these acts after March 2012 in California. Oliva denied having any sexual contact at all with Jane 1. The jury's verdicts finding Oliva guilty on all charged counts involving Jane 1 reveal it believed Jane 1's testimony about the sexual contacts and disbelieved Oliva.

Further still, the jury returned guilty verdicts on counts 7 and 8 (oral copulation by force, fear or threats; former § 288a, subd. (c)(2)(A), now § 287, subd. (c)(2)(A)). In doing so, the jury found Oliva committed acts of forcible oral copulation against Jane 1 between July 4, 2013 and July 4, 2017, a time frame when Jane 1 was 14 years old or older, and the family was living in Oceanside. It is not possible, on this record, for a reasonable jury to find Oliva committed acts of forcible oral copulation against Jane 1 in Texas and North Carolina, but not in Oceanside before she turned 14. Stated differently, " '[n]o reasonable jury that made all of these findings could have failed to find' " Oliva committed more than one act of forcible oral copulation

40

against Jane 1 in Oceanside when she was under 14.  (See *Aledamat*, *supra*, 8 Cal.5th at p. 15.)

The error was harmless beyond a reasonable doubt.

III.

*The Portion of the Criminal Justice Administration Fee That Remained*
*Unpaid as of July 1, 2021 Shall Be Vacated*

At the sentencing hearing, the trial court ordered Oliva to pay a criminal justice administration fee of $154 pursuant to now-repealed Government Code section 29550.1.  The abstract of judgment incorrectly reflects a $300 criminal justice administration fee.

Pursuant to Assembly Bill No. 1869, as of July 1, 2021, the statutory provision pursuant to which Oliva was ordered to pay the $154 criminal justice administration fee was repealed and newly-enacted Government Code section 6111 became effective.  (Assem. Bill No. 1869 (2019–2020 Reg. Sess.) § 11; see *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 950 (*Lopez-Vinck*).)  Under Government Code section 6111, subdivision (a), "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."

Although Oliva is not entitled to vacatur of the entire $154 criminal justice administration fee, as he contends, he is entitled to the vacatur of that portion of the criminal justice administration fee imposed pursuant to former Government Code section 29550.1 that remains unpaid as of July 1, 2021, and to the modification of his judgment consistent with such vacatur.  (*Lopez-Vinck*, *supra*, 68 Cal.App.5th at p. 953.)  However, because we must remand

41

with instructions to the trial court to correct the abstract of judgment because it does not reflect the judgment as it was pronounced (it reflects a $300 criminal justice administration fee, whereas the judgment as orally pronounced reflected a $154 criminal justice administration fee), we shall also instruct the court to correct the abstract of judgment to reflect vacatur of any balance of the $154 fee that remained unpaid as of July 1, 2021.[15]

DISPOSITION

The portion of the $154 criminal justice administration fee imposed by the court pursuant to Government Code former section 29550.1 that remained unpaid as of July 1, 2021, is vacated. As modified, the judgment is affirmed.

The matter is remanded to the trial court with directions to correct the abstract of judgment to reflect that the amount of the criminal justice fee originally imposed was $154, and to reflect the vacatur of any balance of the $154 fee that remained unpaid as of July 1, 2021. The court shall forward a

_____

[15] In reviewing the abstract of judgment, we noted additional apparent errors. On the one hand, section 1 of the abstract of judgment (starting at page 1, and continuing on the attachment) reflects imposition of consecutive sentences on counts 3 through 18. On the other hand, section 6(a) of the abstract of judgment reflects consecutive sentences on counts 3 through 17 (not 18). And section 16 of the abstract reflects that the terms on counts 3 through 17 (not 18) are consecutive to the term on count 21. At the sentencing hearing, the court ruled that "separate consecutive terms are required" on counts 3 through 18 and 21. The trial court's oral pronouncement of judgment controls over the abstract of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185–188.) "Courts may correct clerical errors at any time[.]" (*Id.* at p. 185.) Upon remand, if necessary, the court may, and indeed should, correct the noted discrepancies in the abstract of judgment to ensure it accurately reflects the sentence imposed. (See *ibid.* ["It is, of course, important that courts correct errors and omissions in abstracts of judgment."].)

copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

DO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.